All right. Welcome to day one of the West courtroom panel. I'm honored to be sitting this week with Judge E. Grady Jolly of Mississippi and Judge Priscilla Owen from Texas. So we are the consummate circuit panel in that we represent all three of the states. So hopefully that will aid us in getting to the answers. We have a robust docket for the day and this week. The main rules is just to stay in that microphone. We do record the proceedings and sometimes if you get away from the mic, it can be a little bit difficult to hear. And if you'll just stay in the mic, both in terms of your argument and answering the court's questions, that'll be fine. I think you're familiar with the red light system and so forth, so we just expect you to hear. So having said that, I'll call the first case, United States v. Gross Williams. Ms. Rhodes? May it please the court. Good morning. My name is Celia Rhodes with the Federal Public Defender's Office and I represent Mr. Williams. To begin with, I should ask for this court's patience and understanding. This is my first oral argument and I have to admit, I'm a little nervous. Oh, you shouldn't have told us that to the end. I should have kept my mouth shut. You should have waited to the end to say that. The issue before this court is whether the government has borne its burden of justifying a warrantless search of Mr. Williams' person. Now the lawfulness of that initial search is critical because as the district court found, the evidence derived from it was the basis for a later search of Mr. Williams' home. Now the district court found that that initial search of Mr. Williams' person was consensual and that it provided reasonable suspicion for that later home search. So where do you say, I mean he's a probationer, so typically subject to some, you know, search, etc., anyway. So where in time and otherwise do you say the normal, traditional ability to do a search crossed the line? In this case in particular? Yeah. So I think actually at the onset, with the initial search of his person, because the government's argument to that point is a protective frisk theory. So that doesn't go to his status as a probationer. We're in the sort of normal Terry world. The government bears the burden of showing that Officer Greene reasonably... In this case, if we say you're correct about the first search at the auto dealers' place, where does that get you? So I think, Judge Dolley, your point is getting to the government's argument sort of made in passing in its brief that, oh, well, even if this search was unlawful, it didn't provide any evidence. And I think it's important to clarify the timeline of what happened. According to Officer Greene's testimony, and I think the clearest version... Testimony? Sorry? What does it get you? So I think... Is it your own case? I think so, because the district court found specifically that the evidence derived from that initial search provided the basis for reasonable suspicion, which was the standard required to later search Mr. Williams' home. And it's important to suppress that evidence because that evidence was the basis for his conviction. Well, is that really true? I mean, I thought the basis for the search, which would include both his house, I guess, both his house and the place of business, would have been the tip. Right, so I think the... If the tip is valid, then it seems like the house, his residence, would be searchable, irrespective of what may happen at the auto dealership. So I think that's the government's argument. You're right, Judge Dolley, that if that... I may be right. I don't mean that you're right that the tip itself provided reasonable suspicion, but the government is arguing that immediately upon receiving this vague tip from the DEA, that per se provided reasonable suspicion to search Mr. Williams' home. And I think it's important to note that the government is arguing for a per se rule here, that a tip, a law enforcement tip alone, always provides reasonable suspicion to search a probationer's home. But I think that that is unhinged from this Court and the Supreme Court's case on reasonable suspicion. Specificity is the... You're saying that if the government... I mean, if the government... if they tip... gave a tip that the guy is involved in drugs again, and they find nothing at the dealership, then the tip is not relevant to the mother's house or to his residence. I actually agree with... Is that what you're saying? No. I agree with the District Court on this point, which is it is the tip combined with the evidence obtained at Mr. Williams' business. That's my question. You said the tip can't stand alone, is what you're saying. I think in this case, considering that reasonable suspicion is a totality of the circumstances approach, the tip alone in this case does not provide reasonable suspicion. Of course a tip in certain circumstances, depending on its level of detail and its specificity, can provide reasonable suspicion to search a home. And this Court, for example, in Keith, and I believe Judge Dhali were on that panel, determined that when a law enforcement officer was told by another officer that he had received a tip from a business owner, and the individual had been buying pipes, and he suspected that those materials might be used for a bomb, that that could provide basis for reasonable suspicion. And I agree, certainly. That tip was specific. It provided detail. But in this case, all we have is that the DEA, at some point in time, was provided information by the New Orleans Police Department, which itself, at some point in time, received information from a source, though we don't know who, when, or how. That Mr. Williams was involved in narcotics. Did they have a hearing here? Sorry? Did they have a search and seizure hearing here, a Fourth Amendment hearing? In the District Court? In the District Court. Absolutely. There were two... So you had an opportunity to cross-examine, did you not, about what the source of this information was, and what his confidential informant, what he had said was based upon. Absolutely. And I think that the best... And he didn't do it? Officer Green, who was the probation officer in this case, was cross-examined about this. And he talks about the tip. I think the best descriptions are on 785 and 804 of the record. And he confirms. He doesn't know the source of the tip. He doesn't know when this information was produced. And he didn't know any other details than by his own description that Mr. Williams was involved in narcotics sales. So I think we have Officer Green, the probation officer, confirming on the record that that was the extent of the tip. He didn't know any other information. Was the burden on the government to prove reliability of the confidential informant? So certainly any time we have a warrantless search, it's the government's burden to prove that that search fit within a very narrow range of exceptions to the warrant requirement. And it's the government's burden also to prove the facts necessary to justify that search. And so I do, I think here it was the government's burden to prove the tip was enough. But I think the government put in all the evidence they could. But Officer Green confirmed that he didn't know where this tip came from. Officer Green confirmed that the only information he had was that that information transmitted to him from the DEA, which itself had received it from the New Orleans Police Department. That's all he knew. That someone at some point in time had said that Mr. Williams was involved in narcotics sales. And I think it's important to highlight that Officer Green himself didn't think that this was reasonable suspicion to go immediately knock down Mr. Williams' door and search his house top to bottom. Officer Green, who had previously been planning on terminating Mr. Williams' probation early, so thought this was a model probationer, had no reason to suspect him of criminal activity. He didn't even think this was enough to go back on his recommendation to terminate probation. He didn't think that would be fair. He thought he needed to follow up on this tip to find out more information to make sure it was true. And that was his plan. His plan was to go and figure out, hey, is there anything to this? So the government really is out on a limb by itself here in thinking that this tip was enough. And I want to highlight that the district court, too, didn't find reasonable suspicion as accruing until much later. If the standard is different between probationers and someone who's not, how would you articulate the difference? So I think Knights articulates the difference as being just a lowering from the standard warrant probable cause requirement to reasonable suspicion. I'm concerned that the government is suggesting that there's somehow a different reasonable suspicion standard applicable to probationers. But I think Knights has already factored that in. The Supreme Court has said, you're right, probationers have a lowered expectation of privacy. We are concerned that they're going to recommit. And so we're going to lower the standard. What's reasonable under the Fourth Amendment is reasonable suspicion. You don't think the tip was reasonable suspicion to go talk to him at the dealership? Oh, I absolutely think that it was enough for Officer Green to go talk to him. And that was his plan. Probation officers have a huge amount of tools at their disposal. He can visit Mr. Williams at his business any time at his home. And that's what his plan was. I'm going to go ask him about this tip. What I'm saying is that that tip alone did not provide reasonable suspicion as Officer Green agreed and the district court agreed to go search Mr. Williams. So we're down to the protective sweep at the dealership. Exactly. And that's why I think the district court properly focused on that. Because the question really is whether that initial frisk produced sufficient evidence to constitute reasonable suspicion to then take the next step, to then increase the intrusion and search Mr. Williams' home. And I don't think it did. I think it's important to look at the record in this case. The district court didn't even address this theory. So the district court had no factual findings on this below. So this is a totally untested theory. I want to highlight that. And it's not unsurprising that the district court wouldn't have addressed this. This really was an afterthought below, this protective frisk theory. And that's concerning because Terry is an exceptionally fact-intensive inquiry. As I said, it's the government's burden to prove that Officer Green reasonably believed that Mr. Williams was presently armed and dangerous. And that can't be a mere hunch or an inarticulate suspicion. That reasonable belief must be rooted in concrete, particularized, and specific facts. And it's a two-part inquiry under Minnesota v. Dickerson. So not only do they have to show that this initial intrusion was justified at the onset, that there was reason to believe Mr. Williams was armed and dangerous. The scope of that search cannot go beyond what is necessary to discover weapons. The moment that the scope of that search goes beyond that is unconstitutional. And the evidence must be suppressed. And so Officer Green, and I believe that he talks about this twice, only twice in the record, very briefly, at 805 and 789. At those points, he sort of mentions in passing, oh yeah, I needed to reach into his pockets and remove its contents because there were bulges and drugs equals guns. Sort of that very vague, unparticularized, devoid of context argument. The government didn't follow up on that. The government didn't say, what did the bulges feel like? How big were the bulges? Why did you need to remove the objects from his pockets? And I think it's important to note the scope of this, what the search actually was. And this is borne out in the video. How much was in his pocket? It ultimately ended up being $10,000, though he didn't know... Big bulge, right? Well, it was in multiple pockets, to be fair. And one of those pockets, one of those pockets was under Officer Green's own testimony, just the breast pocket. And he was saying, oh, well, maybe they're drugs, so maybe they're guns. And he's talking about a breast pocket. So we don't have testimony of him justifying why he thought... I mean, if you're patting someone down for a small... Pistols can be fairly small. Yeah. A bulge, and you reach in to see what it is, and you come out with cash. Absolutely, though I think in cases where we're sort of in the weeds on these factual inquiries, we actually have testimony on this. And so, and I want to... Don't we give the reasonable inferences in favor of the winning party, which is the government here? I think that that is normally, in this case, I mean, I know that that is normally, in this case, the rule. This case is special, though. I want to note also at the onset, I think even if you do that, this still is not justified, that the government failed to lay a factual foundation for this. But in this case, this is a totally untested theory. This isn't an instance where a district court went through the normal inquiry. Well, the frisk wasn't justified at the onset, but for some other reason, intervening factor, it wasn't that the district court went through the inquiry, and the government is now trying to cut it off at a different point. This is a totally untested theory, and there have been no factual findings on it. There's been no resolution of any of these questions. Restate what you are saying is the untested theory. That this was a protective frisk. The district court didn't consider this theory. The government is relying on sort of inconclusive statements throughout the record and trying to bundle together a protective frisk theory. So this is very unique. We're not talking about construing facts in favor of the government. I think we're talking about construing a void of facts in favor of the government. It's not about resolving factual disputes in favor of them. There's just no testimony on this. And to my read, Officer Green didn't even seem to actually testify that he thought this individual was dangerous. And there's no reason for him, for us to think that he did think this way. When a probationer comes into the probation office, are they subject to any kind of search to see if they're packing, well, carrying a weapon? Certainly not automatically. I mean, Terry still applies to probationers, and these two individuals had interacted on numerous times before. When they come into the police office or meet their probation officer, they're not subject to a search for any kind of weapon? Not that I'm aware of, though I do know that Officer Green said he had never felt the need to pat down Mr. Williams before. I mean, he knew a lot about him. I mean, the person in this operation who knew the most about Mr. Williams was Officer Green. He knew... When can you do a protective sweep of a probationer? When it is supported by reasonable suspicion, combined with a condition of probation, reasonable suspicion that an individual is engaged in criminal activity. And that reasonable suspicion standard is the broadly applicable standard. This is a narrow area of law, but luckily we have a huge amount of case law on this reasonable suspicion standard, and that case law is long settled and clear, that you need specific, particularized facts. And I think that Griffin, for example, which the government relies on, doesn't cut against that. In all the cases where these searches have been justified based on reasonable suspicion, there have been specific facts. We haven't had to worry about whether this information, which came through a game of telephone through these various agencies, had just been sitting somewhere dusty in a police file. We had some information. We had some greater level of specificity. We knew it was more current. It had predictive value. There was some factor that had been ratcheted up. Here we have a baseline of almost nothing. And I think the Louisiana Fifth Circuit's decision in Salisbury is the most analogous case to that. They said that a tip almost identical to this one didn't rise to the level of reasonable suspicion. So I don't think it's surprising that the government has struggled to find an analogous case to support its argument. This is, by my read, almost the lowest possible bar the government has chosen to set in this context. We have a tip devoid of any specificity about a model probationer supporting a search of a home, the most protected sphere under the Constitution. All right. Thank you for your time. Mr. Howell? Good morning. May it please the Court. This Court and the Supreme Court have recognized that a state's supervision of its probationers is a special needs area that justifies diminished expectations of privacy. A probationer like Mr. Williams has been convicted of a crime, here a serious felony crime, and in order to avoid going to jail, agrees to a conditional liberty. In order to effectively supervise those people and respond to information. Yeah, but that doesn't get you, according to what she's saying, and the case law supports it, that doesn't get you anywhere unless you show reasonable suspicion. So, yeah, I mean, she says we're out on a limb saying that the tip is sufficient. If you look at Griffin v. Wisconsin, the tip there is literally the probation officer testifies he can't even remember the police officers that told him. It's just a tip that there may or could be guns at the house, and the Supreme Court specifically holds that that tip is sufficient to justify a reasonable suspicion search. Here you have a guy that's... You're essentially arguing that the fact that he was on probation defines reasonable suspicion  When you look at Griffin, it's hard to say that a tip where there's no further investigation, no basis of... What are you saying? I mean, are you saying yes or no? I think that reasonable suspicion differs in the context... The reasonable suspicion necessary to conduct a pat-down is not necessarily the same reasonable suspicion necessary to do something more invasive than that. So I think Griffin stands for the idea that reasonable suspicion is good enough based on a tip and then it doesn't have to have all of the corroborating information because there's all kinds of reasons why local law enforcement might not want to share all the underlying details with the probation officer. The Supreme Court has never said as much specifically. It doesn't say we are applying a lower standard of reasonable suspicion to probationers. It doesn't say that. And again, the Griffin, I think, is the appropriate way to read Griffin and that the search combined with his history of drug trafficking combined with how he had his house set up where nobody could access it without first alerting him rises to reasonable suspicion. The district court... He might just be trying to protect his family and himself from past contacts. Absolutely. I mean, a lot of things don't have to totally eliminate the potential of criminality. Is there any evidence about the timing of the tip? In other words, how old the information was at all? No, Judge, and I think the reason that didn't come in is because probation officer Green was the one relaying the information about the tip and he just didn't ask those questions when they told him. He didn't say, okay, tell me who gave you this tip, where did it come from? So, no, that's not in the record. And again... Green was somewhat in, I guess, disbelief because, I guess, facts show he was ready to terminate the guy off of probation because he had been a good probationer, et cetera, et cetera. So is it fair to say when he received the tip he was sort of, well, I don't know if it's fair to say skeptical, but he wasn't probing it because he kind of didn't find that it fit his appreciation of his probation. Is that a fair way to put it? I think that what he said was he wanted to immediately get to the bottom of it because here he is about to write an early termination thing. He walks into a meeting with his bosses and federal agents and they tell him, hey, that guy that you think is a model probationer we think is involved in drug trafficking again. So he talked about it in terms of wanting to dispel or get to the bottom of that so that he could make an accurate representation to the state court. And, again, on the pat-down, going back, so Griffin, the district court, didn't rule on that basis. I think this court can. But getting back to the actual facts of the pat-down, the problem with their argument is that they're trying to condense everything that happened at the car dealership to the pat-down. But the facts are that when Green shows up, he Mirandizes Williams. He tells him what happens. Williams tells him I have $15,000 on my person before he ever does the protective pat-down. Then he does a pat-down after. What's the reasonable suspicion for that? For the pat-down or for the? Well, the reasonable suspicion is he has been informed the guy is dealing drugs again. He knows that he has a history of drug dealing. He's in a high-crime area. The dealership is in a high-crime area? Yeah, he testified it was an extreme high-crime area, I believe, where the probation officer is lying. High-drug area or high-crime? I think he said crime. Then he also said, in my experience, where there's guns, there's often drugs, which this court has endorsed over and over. Then he sees the bulges, as Judge Stewart said, $10,000 in a bunch of different pockets. We're not talking about a little bulge. She says you made this up after the fact. I don't understand what you. Well, I mean she says that that was never given as a reason by the officer for the pat-down. It was during the hearing. He specifically said, I saw bulges. I pulled it out because I couldn't tell what was behind the bulges. But, again, the thing about the pat-down, he's already told them about the money. The district court didn't. I argued that it was very suspicious that he had $15,000 or said $15,000. It was actually $10,000. He was reporting to make $2,000 or $2,500 a month. I argue that's extremely suspicious. Okay, so. The district court didn't buy that argument. The district court focused on his conflicting explanations for the money. So if you take the physical pat-down of the money out of the equation, he still has said he has the money. There's no fruit of the poisonous tree. He mirandized him. He says he's got the very contraband they're seeking to suppress. All right, so is it your position that as soon as he said he had $15,000, they could bring in the drug dog to sniff the money? Well, so the drug dog sniffing the money happens outside. The district court didn't rely on that. When did that happen? That happens after they leave the dealership. Somebody goes with the money back to St. Bernard Sheriff's Office to have a neutral environment to do the search. But the district court's determination that there was reasonable suspicion and probable cause did not depend at all on that dog's sniff. But they could take the money to go get it tested, right? Yes, I think they could seize the money. Did they get the search warrant for the home after they tested the money for drugs? They never got a search warrant for the home. The reason the search of the home, he admits in the car while they're at his. . . What they're looking for is the gun. But they're already searching his mother's home. It's clear they're headed to his home at some point. Yes, from the very start. At that point, did they know that the money was tainted with drugs? By the time they got to his house? By the time they got to the mother's house. I don't know if they'd already relayed it by the time they got to the mother's house. I don't know the answer to that. But the district court didn't rely, again, on the dog search at all. The district court found that there was reasonable suspicion of probable cause based on the tip, the setup of the house, the conflicting stories about where he got the money, his reaction to the DEA, the fact that he said he couldn't leave the business but his wife was actually there. All that series of things that are ticked off doesn't depend at all on the physical money. I argued that the physical money was suspicious, and the district court said, no, this is a potential cash-type business. I'm not going to attribute a lot of significance to that. So I don't understand their argument that we come back and the district court says nothing's incriminating about the money so you couldn't seize it because it's not incriminating, but yet if you take that out of the equation, all of a sudden the finding of reasonable suspicion and probable cause falls apart. It doesn't make any sense. The statements are not going to be suppressed even if you find that there's no basis to suppress the statements about the money even if you found the pat-down was bad, which I think is not the right thing to find. I mean, a probation officer has the – it's not really a true Terry situation. A probation officer has the ability to go and interact with this person. Well, assuming for the moment the initial pat-down isn't what the case turns on, right, wrong, or otherwise, what's the principal theory that you relied on below and rely on here for the search, et cetera? I didn't hear that as part of your question. I'm sorry. Well, assuming the frisk, the pat-down itself isn't what drives the case, something wrong with it, not enough, whatever. Okay, what's the principal theory you relied on below in the district court and that you rely on here to justify reasonable suspicion and the search? Well, what the district court held after the – That's not my question. I'm saying what's the principal theory you, the government, relied on putting aside the pat-down as the basis or foundation of the reasonable suspicion? Well, I mean my first-line argument is that under Griffin, the tip, combined with his drug-dealing history, combined with the setup of his house, is enough for them to go do a search of his house. But that's not what you relied on below. I did argue that below the district court didn't reach that. The district court held a hearing and limited the hearing to the actions that took place at the car dealership. Okay, well, Griffin, in your brief, you said there, you know, the Supreme Court found the tip okay, but in that case, there was a state regulation that authorized, quote, any probation officer to search a probationist's home without a warrant as long as the supervisor approves and as long as there's reasonable grounds to believe the presence of the contraband item that the probationist can't tip, quote, unquote. So are you arguing that the factual circumstances in Louisiana were the same as in Griffin, where there was this state regulation that provided the extra anchoring for this tip reasonable suspicion? I mean, I read that statement, the state regulation lowers the standard from probable cause to conduct a warrant. But it doesn't say that. I mean, I'm reading straight out of your brief, you know, where you cite Griffin, pages 14 and 15. I'm trying to understand, since that wasn't a basis relied on below, but you're urging Griffin here in rebuttal to what the defense has argued. I'm trying to better understand how Griffin in and of itself is the support for your theory when in answer to Judge Jolly's question, you said it doesn't expressly deal with the situation here. So that's what I'm trying to understand. And when I read this and it says, well, there was a special state regulation in Wisconsin, then that makes me feel, well, Griffin was based on a particular situation in Wisconsin. So my question is, should we read Griffin as specifically as you want us to read it, or is it limited to that special circumstance where there was a regulation when there's nothing here in the briefing that says Louisiana's the same? If I answered Judge Jolly that I didn't think that they were the same, I think they are the same. Louisiana has a regulation under Article 895 subsection 13 that specifically says that the probationer has to agree to searches of his person, property, place of residence, vehicle, or any or all of them at any time by a probation officer with or without a warrant, and with or without – when the probation officer has a reasonable suspicion to believe that the person is engaged in criminal activity, which is the same thing as what the Supreme Court – how the Supreme Court interpreted the Wisconsin statute, that as long as you have reasonable suspicions – It seems certain in saying it can do it when the probation officer has a reasonable suspicion, but the whole question is, was there a reasonable suspicion? Right, and what I'm saying is in Griffin an unsubstantiated conditional tip was held by the Supreme Court to be reasonable suspicion to conduct the search. This is the same – I mean this tip is basically the same thing as the tip in Griffin. That is my first line argument. The second line argument is that the series of specific and articulable facts that were established at the evidentiary hearing of what happened at the car dealership easily meets the standard for reasonable suspicion, even if the pat-down is bad. The admission of the money, the conflicting story about the origin of the money, the visceral physical reaction to the arrival of the DEA despite many other law enforcement officers already being present on scene, the then changing story of where the money came from, the fact that part of the money was attributable to a person he said was Kwan from Mafia Motorsports, who Probation Officer Green had heard the name and his supervision of other people as a major player in drug trafficking. All of that, which was explicitly found by the district court, is easily reasonable suspicion and justifies the later searches. If you take out the physical money, it doesn't change that analysis at all. So those are the two primary arguments. If you don't want to reach the facts, you can say Griffin, that's a broader holding and not one that the district court made, but this court can affirm on any ground. But at a minimum, the district court's analysis of the facts goes way beyond inarticulate hunch or the – it's specifically inarticulable things that he went, after getting the tip, above and beyond what I think he had to do and did some investigatory work way before they get to the search of the house. We didn't even touch on the fact that he confesses to having the money in the gun. The district court didn't really base its holding on that, and he had a written consent to search his house. If there's no further questions, I'll sit down. Thank you. All right. Back to you, Ms. Rhodes. With the court's permission, I'd like to focus on two points in particular. First, I want to clarify the timeline of the frisk and the evidence that was seized and the value of that evidence, and then speak briefly to Griffin, because I think there may be some confusion about two independent strains of case law. The government appears to be suggesting that we shouldn't care about this unlawful frisk. So even if there was unlawful action here, we don't care because it didn't produce any valuable evidence. So I just want to clarify what I think is a pretty confusing timeline, and I think the clearest explanation of this is on 789. According to Officer Green's own testimony, he came to the business, he approached Mr. Williams, and he immediately said, Hey, Gross, do you have anything on you I need to know about, anything illegal, anything sharp, anything that could hurt me? To which Mr. Williams simply replied, according to Officer Green's testimony, no, I just have money. So he didn't say how much and that it was quite a bit. He didn't say where it came from. He didn't say who it was associated with. And he certainly didn't say it had drug residue on it. And so certainly, after that innocent statement, we wouldn't think a police officer would think anything of it. Most of us have money on us. It was what came next. $10,000 pocket change. Well, he didn't. I think it's important, Judge Sholley, to remember that he didn't know how much money it was at that point. It's true. There were rolls of money, though we don't have much evidence in the record how big those were. We just know that they created some bulges. But it was only after, at that point, that's when the unlawful action poisoned the well. And it was that search, that unlawful search, that bore tremendous fruit. It was only after Officer Green not only saw those bulges but reached into the pockets, removed the money, looked at it, examined it, seized it, and then passed it off to be counted and drug tested that he knew that it was a large amount of money, that he knew precisely the amount of money, that he knew its organization, its denominations. And he specifically said, I found that suspicious. It was large denominations. It wasn't in order. He also said, did you know, that in view of his annual income being around $20,000, when he has $10,000 pocket change, that is quite suspicious. Absolutely. And I think the fact that, and the district court found this, the fact that he had this much money combined with other factors is suspicious. But he didn't know the amount of money beforehand. Well, he said, I don't have anything illegal. I just have money. So what were the bulges? I mean, doesn't that allow a reasonable search to see what the bulges were? And then you see it's in rolls, and there's a lot of it. So under Terry, so under protective frisk, that's only permitted if the officer specifically testifies, I thought those bulges were weapons. Or during the course of the pat-down, I felt those bulges. And I still thought it was a weapon. I think Majors and Judge Dolly, you were on that panel. Again, in that case, the officer specifically testified. He first had reasonable suspicion to believe that the individual was armed and dangerous. He conducted the limited pat-down permitted by Terry. He felt a bulge, and he described it. He said, it's large. This is how it felt. And I couldn't rule out that that wasn't a weapon. I thought that might be a weapon. So what I did is I just lifted the top of the pocket, and I looked inside. And I saw that it wasn't a weapon, so I did nothing more. And it turned out that was cocaine. But he, importantly, specifically testified that that's what he needed to do to rule out that the object was a weapon. Here, Officer Green didn't believe that these objects were weapons. So he doesn't even have justification to pat down, not to mention to remove and examine these objects. So it was only after that action, that action of removing objects from Mr. Williams' pockets, looking at them, seizing him, that he had this great deal of evidence that Mr. Williams was questioned about the specific observations that they had made upon seizing and looking at this evidence, that he said, after heavy questioning about this money that they were holding in front of them and saying, look, this is $10,000, where did this come from, that he said it was associated with an individual that Mr. He says, I've just got money. He sees Baldas. And so someone could logically think he must have a lot of money on him. I touch it. Aren't you entitled to ask a probationer, why do you have large bulges of cash on your person? It's true. You're entitled to ask the probation officer that question. I think Officer Green said, if this had even been $2,000, I wouldn't have thought anything of it. Because, again, this is a car dealership. They deal in money. So I think there's certainly no testimony that he could tell it was that large of an amount of money.  Roles tend to make a bulge. I mean, it's not like it's $2,000 to $1,000 bills flat in a wallet. Of course. Though it could be, of course, a number of $1 bills. We don't know the denomination. But we know the role made a bulge. Yes. The role of money, though, again, I think that a lower amount of money could certainly also make a bulge. Officer Green specifically noted these were large denominations. I think we have your argument. All right. Thank you.